## ERVAN WORK v. STATE.

No. A-9293.   Jan. 28, 1938.
(75 P. 2d 1161.)

Justin Hinshaw and Tom W. Cheatwood, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Aubry C. Moses, Co. Atty., for the State.

BAREFOOT, J.   Defendant was charged with the crime of rape in the first degree in Cleveland county, was tried and convicted of assault with intent to rape, and was by the court sentenced to serve a term of one year in the reformatory at Granite, and has appealed.

The facts in the case are that defendant, who was 19 years of age, was charged with rape by force on July 21, 1935, upon one Vera Waldon, 21 years of age.   Both

the defendant and prosecutrix lived in the Box community in the southeast part of Cleveland county. On the evening of July 21st, which was Sunday, prosecutrix attended services at the Box church. A friend and neighbor of hers, Mrs. Flora Boggs, also attended the services and had with her her small three-year-old child.. During the services and about 9 o'clock the child wanted a drink of water and Mrs. Boggs asked prosecutrix to go with her for the purpose of securing the same. They left the church to go to a grocery store owned and operated by Clark and Mary Carruthers and which was located about 300 yards west of the church. When they had gone not quite half of the distance, they met defendant and a boy by the name of Jesse Potter. This party said: "Let's walk with you." He had been drinking and defendant had left the church for the purpose of taking care of him. Prosecutrix replied that they did not know him, but the evidence shows that they walked on toward the store; the defendant, Ervan Work, walking with prosecutrix, and Jesse Potter with Mrs. Boggs. Jesse Potter was drinking and wanted to carry Mrs. Boggs' baby, and there was some discussion with reference thereto. They arrived at the store and remained there a few minutes after drinking soda pop which the defendant purchased. Mrs. Boggs whispered to prosecutrix and they immediately started back toward the church. Defendant started back also, and walking with prosecutrix and holding her by the arm. Mrs. Boggs went on ahead, and Jesse Potter hollered at defendant to catch his girl, she was getting away. Mrs. Boggs ran on ahead and left defendant and prosecutrix behind. Jesse Potter remained at the store. Two residences were located between the church and the store. The one on the north side was the home of Jim Potter and his family, and the one almost opposite and

on the south side of the road was the home of R. E. Webb and family.. Up to this point the evidence of prosecutrix and defendant is identical. Prosecutrix testified that when they reached a point opposite the Jim Potter home, the defendant said: "Let's go in and see Jim." She said: "Jim isn't home." She had seen him and his family at the church services. There was a turnstile at the entrance to Jim Potter's home, and when prosecutrix told him he was not at home defendant grabbed her around the waist with both hands and carried her into the yard; that she begged him to turn her loose and told him if he did not she would scream, and defendant said: "Yes, and I'll kill you." That because of his strength she was not able to get loose; that she was afraid that he would carry out his threat to kill her; and that he threw her down on the ground and had intercourse with her. Her testimony was that immediately thereafter she started down the road to the store, and that she saw defendant going toward the store along the inside of the fence, and that when she arrived there she saw May Carruthers, Clark Carruthers, also her brother, Ira Waldon, Donald Mantooth, and Raymond Douglas, who were at the store when she arrived; that she immediately told May Carruthers in the back room what had happened, telling her a part that night and a part the next morning; that as she went home that night, after the church services, she told Flora Boggs about it the first time she had a chance to talk to her privately; that she told her mother about it that night when she returned home and her father when he returned home the same night. Her underclothing were exhibited to the jury and were torn and stained. She testified that they were clean and in good condition prior to the assault made by the defendant. Some of the witnesses at the store testified that her clothing was dis-

arranged and her hair disheveled, and that she was crying when she came to the store. Others testified that they did not notice her clothes being dirty or her hair being disheveled or did not notice her crying.

May Carruthers, the first person with whom prosecutrix talked after the attack, testified for the defendant. She testified that prosecutrix was not crying when she came in the store, and she did not notice her clothing being disarranged, but said: "Her hair was tousled a little." She further testified as follows:

"Q. Did Vera Waldon tell you anything at that time about being assaulted by Ervan Work? A. No, she didn't say he insulted her. Q. What did she say? A. She just said she was mad. I said, 'Who are you mad at?' She said she was mad at Ervan. Q. Did she say what she was mad at him for? A. No, she asked me could she stay there until church was over, she didn't want to go back up there. Q. She did stay there? A. Yes, sir, she did. Q. She tell you that anything had happened? A. Not that night. Q. She did return the next morning? A. Yes. Q. What did she tell you about it next morning? A. She said he insulted her. Q. Did she say 'insulted'? A. She didn't put it that way, she didn't say 'insulted.' Q. Tell any other way she said it. A. She said Ervan didn't treat her very nice, they had a big rookus, he tried to have intercourse with her. When she first told me, I said: 'Did he?' She said, 'No.' Then she kept talking. She was there a couple of hours I guess, maybe longer. She said: 'Well, I'm going to tell you the truth, he did.' Q. She first told you he didn't? A. Yes, she did. Q. Did she tell you anything about having promised Ervan she would have intercourse with him? A. Yes, she did. Q. When did she tell you that, that morning? A. Yes, sir. Q. That she had promised previously that she would have intercourse with him? A. Yes, she did."

On cross-examination, she was asked:

"Q. I will ask you if you didn't have a conversation with John Blackburn on Tuesday following this Sunday morning, in which you told John Blackburn in these words, or in substance—at your store, there at Box, in which you told John Blackburn 'that Vera Waldon came in here Sunday night crying, she was all mussed, her clothes were dirty and told you that Ervan Work had attempted to rape her? A. No, I didn't tell him them words at all. Q. What did you tell John Blackburn? A. I don't remember what words I used, but I didn't use them kind of words. Q. When did you have that conversation with him? A. I don't remember, but it was after this happened."

John Blackburn testified that the witness May Carruthers told him on Tuesday morning following the Sunday night on which this occurred, in substance, that:

"Q. I will ask you if you didn't have a conversation with her in which she said in substance: 'Vera came into my house Sunday night, her hair was all ruffled or mussed up, her clothes were dirty and torn and her face was dirty, and I helped wash her up and that Ervan Work had assaulted her, and that he ought to be killed and shouldn't be allowed to live.' Did she tell you that? A. You'll have to talk * * * Q. Did she say those words to you or that in substance? A. In substance—wasn't exactly the same words."

Mr. C. I. Adams testified as follows:

"Q. I will ask you to state whether that conversation wasn't in these words or in substance—'Vera came into my house— That Vera came into my house last night, I never saw more disheveled, more ruffled clothing, and hair than she had and if he had done that he was onery, dirty and ought to be prosecuted?' A. Yes, sir. Q. That is what she told you that night? A. Yes, sir. By the Court: Q. When did she tell you that? A. Next morning after this offense was committed."

Kee Durkee, a deputy sheriff, testified as follows:

"Q. Did you have a conversation with Mrs. May Carruthers in front of her store on that morning? A. Little past in front of the store I had a conversation with her. Q. In which she said that 'Vera came into my house last night and I never saw more disheveled or more ruffled clothing on a person or more ruffled hair than she had and that if Ervan had done that he was onery and dirty and ought to be prosecuted?' A. Correct. Q. That was the conversation she had with you? A. Yes, sir."

The evidence further revealed that the defendant left the community the day following the occurrence, going into different parts of Oklahoma, to California and Texas, and finally being located at Shidler, Okla., where he was working for an oil company under the name of Buck Hershel, on November 1, 1935.

Prosecutrix was examined by Dr. J. B. Lambert, of Lexington, who testified as a witness. He said he noticed a discoloration on one side of her neck. She had testified that defendant had bit her on the neck. Dr. Lambert's testimony was as follows:

"Q. Go ahead and describe to the jury the condition you found in the vagina of this young lady. A. I didn't find any pathology around in the vagina or about the vagina or about the vulva at all and I could barely admit one finger through the hymen. Q. Had this young lady had complete intercourse then at that time, in your opinion? A. In my opinion she had never had complete intercourse at that time. Q. Could you tell whether or not she had partial intercourse? A. There was no recent evidence or damage to the hymen. The hymen barely admitted one finger. Q. Then would you say if there was intercourse or penetration, it had been up to the hymen and not completely past the hymen, is that right? A. Yes, sir."

Cross-examination by Mr. Cheatwood:

"Q. Did you make any further examination except just her private parts there to determine whether she had been recently attacked or raped? A. I examined the vulva and the lips all around there for evidence of any bruises. Q. Did you find any? A. I did not. Q. Did you prescribe any treatment for her that you now remember of? A. I don't recall that I did. I'm not positive."

Redirect examination by the county attorney:

"Q. Dr. Lambert, say that on Sunday night, July 21st, 1935, when your examination occurred on Tuesday afternoon the 23rd, could it have been possible that this girl could have been attacked to such extent that there was some penetration to have caused some bleeding around the private parts and not have been discernible at the time of your examination? A. No, sir, I think not. Q. You didn't find any evidence of that? A. No, sir. Q. Wouldn't it be possible that there could be some slight laceration there to have produced some amount of blood and not be discernible the following Tuesday, had it occurred on Sunday? A. It is possible that a slight laceration could have occurred and be overlooked. A laceration of any consequence would not have been overlooked."

Recross-examination by Mr. Cheatwood:

"Q. I will ask you, from your learning as a physician and observation of patients from time to time, especially, the private parts of females, in your judgment would it be possible or probable, that an assault to rape by a man of the size of the defendant in this case, this young man here, could have been perpetrated upon a female of the age and size of Vera Waldon, the young lady here, you know her? A. Yes, sir. Q. Could be done to the extent you found it without—and it be done by force—without tearing the hymen all up, rupturing it completely—do you think that could be done? A. I don't know, I don't think it would have been possible for anyone, a grown individual, to have had complete sexual intercourse with this girl without having produced more damage than was evidenced."

Prosecutrix's testimony was further corroborated by her brother, mother, father, and sister, and by Mrs. Flora Boggs.

Defendant testified in his own behalf and denied that he had used any force in having intercourse with prosecutrix, but that it had been voluntary and agreeable upon her part; that she had made prior promises and had fulfilled them on the night of July 21st. He explained his flight by testifying that he did not desire to be arrested and suffer the humiliation of a trial upon a charge of which he was not guilty. In reference to using an assumed name he said this was done for the purpose of holding his job. He testified to his marriage subsequent to this occurrence, and other witnesses contradicted certain testimony of the prosecutrix, and he also introduced witnesses who testified to his previous good character and reputation. It will thus be seen that there was a direct conflict in the evidence. Under the evidence of prosecutrix, defendant was guilty of rape by force and his punishment could have been assessed under the law at death or not less than 15 years in the penitentiary. Under defendant's testimony he was not guilty. If no force was used and the prosecutrix had voluntarily submitted to the act of intercourse, then he was not guilty of rape by force. The jury were the final arbitrators of his fate. They saw and heard the witnesses, observed their demeanor upon the stand. They had the best opportunity to judge the truthfulness of the statements of those witnesses. They were from the home county of both the parties, and under the law their judgment ought to be final. They found the defendant guilty of assault with intent to commit rape, and left the punishment to the court. The court assessed punishment at one year in the reformatory. The defendant has been ably repre-.

sented. His defense was placed squarely before the jury, and they decided the issue against him. Under the law and facts he could have been given much more severe punishment. He has received a fair and impartial trial, and therefore the judgment of the district court of Cleveland county is affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.